IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



**UNDER SEAL**

UNITED STATES OF AMERICA

v.

HOWARD LEE STITH, JR.,

*Defendant.*

Case No. 3:23-cr- ||0

18 U.S.C. §§ 1343 and 2
Wire Fraud
(Counts 1-21)

26 U.S.C. § 7206(1)
Filing a False Tax Return
(Count 22)

26 U.S.C. § 7201
Evasion of Tax Assessment
(Counts 23-25)

26 U.S.C. § 7203
Failure to File Income Tax Return
(Counts 26-28)

18 U.S.C. §§ 1014 and 2
False Statement to a Financial Institution
(Counts 29-30)

Forfeiture Allegation

## INDICTMENT

August 2023 Term – At Richmond, Virginia

### GENERAL ALLEGATIONS

At all times relevant to the Indictment:

A.   DEFENDANT & DEFENDANT'S FINANCIAL ACCOUNTS

1.   HOWARD LEE STITH, JR., (hereafter "STITH") resided in Freeman, Virginia, within the Eastern District of Virginia.

1

2.      Among others, STITH opened, maintained, and used the following bank accounts at the following financial institutions, as that term is defined in Title 18, United States Code, Section 20:

| Financial Institution | Account Type | Last Four Digits of Account | Accountholder(s) | Approximate Account Opening Date |
|---|---|---|---|---|
| BB&T | Checking | 0457 | Howard Stith | 04/11/2018 |
| BB&T | Savings | 0411 | Howard Stith | 04/11/2018 |
| BB&T | Joint Checking | 6363 | K.S. Howard Stith Jr. | 02/04/2019 |
| BB&T | Checking | 5049 | Howard Stith Jr. | 09/30/2020 |
| BB&T | Checking | 2521 | Howard Stith Jr. | 09/30/2020 |
| BB&T | Business Checking | 1989 | HLS Trucking LLC | 09/30/2020 |
| BB&T | Business Checking | 2063 | Howard Stith Jr. DBA Howard Stith Roofing | 09/30/2020 |
| Credit Union of Richmond | Savings | 2792 (01) | Howard Lee Stith Jr. | 07/19/2018 |
| Credit Union of Richmond | Joint Checking | 3526 (11) | R.D. Howard Lee Stith Jr. | 02/25/2020 |
| Primis Bank | Savings | 5945 | Howard Lee Stith Jr. | 9/12/2017 |
| Primis Bank | Checking | 5957 | Howard Lee Stith Jr. | 9/12/2017 |
| Virginia Credit Union | Savings | 6898 | Howard L Stith Jr | 2/1/2019 |
| Virginia Credit Union | Checking | 8164 | Howard L Stith Jr | 2/1/2019 |
| Virginia Credit Union | Checking | 4067 | Howard L Stith | 11/13/2019 |

2

3.      Virginia Credit Union ("VACU") is a financial institution, as defined in Title 18, United States Code, Section 20, headquartered in North Chesterfield, Virginia.  VACU processes all electronic transactions, including deposits, through its servers in Chesterfield, Virginia, within the Eastern District of Virginia, via a clearing house company located outside the Commonwealth of Virginia.

4.      Credit Union of Richmond ("CUR") is a financial institution, as defined in Title 18, United States Code, Section 20, headquartered in Richmond, Virginia.  CUR processes electronic transactions via servers located outside the Commonwealth of Virginia.

B.      SMALL BUSINESS ADMINISTRATION

5.      The United States Small Business Administration ("SBA") is an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disaster.

C.      UNEMPLOYMENT INSURANCE

6.      Unemployment Insurance ("UI") is a joint state-federal program that is intended to provide temporary financial assistance to workers who become unemployed through no fault of their own and who meet certain eligibility requirements.  Each state administers its own UI program through its state workforce agency ("SWA"), but all states follow the same guidelines established by federal law.

7.      The U.S. Department of Labor ("DOL") funds administrative costs for each SWA related to the UI program.  The federal UI trust fund finances the costs of administering UI programs, loans made to state UI funds, and half of extended benefits during periods of high

3

unemployment. States can borrow from the federal UI trust fund if their own reserves are insufficient.

8.      UI benefits are funded primarily through federal and state employer payroll taxes, which are assessed based on information reported by employers, including wage reports listing, among other items, individual employees and the wages they were paid in each calendar year quarter. Employers are required to remit unemployment tax payments based on the amount of gross wages reflected in these quarterly wage reports. SWAs keep and maintain records of those reports.

9.      Individuals who have lost their jobs can apply to their SWA to receive UI benefits. If such an individual meets certain requirements, including having received a sufficient amount of wages (as reported by their former employer) prior to separation, they become eligible to receive UI benefits.

10.      SWAs receive and process applications for UI benefits via the Internet through their respective websites. Such applications must include the claimant's personal identifying information ("PII"), including their name, date of birth, Social Security number, address, and phone number, among other information.

11.      After the SWA processes and authorizes the claim, a financial institution, pursuant to a contract with the state government, receives and disburses the authorized benefits, either by direct deposit into the account the claimant designates to receive such funds or onto a prepaid debit card mailed to the address included in the claimant's application for benefits.

12.      Once their initial claim is approved, the claimant can then file to receive benefits on a weekly basis by certifying online that they remain unemployed and eligible for benefits. SWAs receive and process these certifications via the Internet through their respective websites.

Based on the claimant's certifications, the SWA will continue to authorize payment of available UI benefits as described herein.

13.     The SWA responsible for overseeing Virginia's UI program is the Virginia Employment Commission ("VEC").  UI benefits from VEC can be applied either to a prepaid debit card account or credited through direct deposit to a claimant's financial account, which is established when the claimant provides their financial institution's routing number and their personal account number at the time they make their initial application for benefits.

D.     COVID-19 PANDEMIC & ECONOMIC RESPONSES

14.     On or about March 13, 2020, the President of the United States declared a national emergency recognizing the threat that the novel coronavirus, known as SARS-CoV-2, and COVID-19, the disease caused by SARS-CoV-2, posed to the nation's healthcare systems. The President also determined that same day that the COVID-19 outbreak constituted an emergency, of nationwide scope, pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), Title 42, United States Code, Section 5191(b).

15.     On or about April 18, 2020, the President further declared that a major disaster existed in all States and territories as a result of COVID-19 pursuant to section 401 of the Stafford Act, Title 42, United States Code, Section 5170.

*Expanded Unemployment Insurance Benefits*

16.     On or about March 18, 2020, the President of the United States signed into law the Families First Coronavirus Response Act, which provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic.

17.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on or about March 27, 2020.  It expanded states' ability to provide UI benefits for many

5

workers impacted by the COVID-19 pandemic, including workers who are not ordinarily eligible for regular UI benefits.

18.     Specifically, the CARES Act created the Pandemic Unemployment Assistance ("PUA") program.  Under PUA, states are permitted to provide UI benefits during the COVID-19 pandemic to individuals who do not qualify for regular UI benefits, including business owners, self-employed workers, independent contractors, those seeking part-time employment, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic.

19.     To qualify for PUA benefits, an individual must not be eligible for regular UI benefits and be unemployed, partially unemployed, or unable or unavailable to work because of certain specified health or economic consequences of the COVID-19 pandemic.

20.     The CARES Act also established the Pandemic Emergency Unemployment Compensation ("PEUC") program.  PEUC covers most individuals who have exhausted all rights to regular UI compensation under state or federal law and who are able to work, available for work, and actively seeking work as defined by state law.  PEUC also gives states the flexibility to determine whether an individual is actively seeking work if the individual is unable to search for work because of COVID-19, including because of illness, quarantine, or movement restrictions.

21.     Finally, the CARES Act also established the Federal Pandemic Unemployment Compensation ("FPUC") program.  FPUC allowed states to give an additional $600 per week to individuals collecting regular UI compensation, PEUC, PUA, and other approved state programs. FPUC benefits expired on or about July 31, 2020.

22.     On or about August 8, 2020, to further offset the pandemic's impact on American workers, the President authorized the Federal Emergency Management Agency ("FEMA") to

expend up to $44 billion from the Disaster Relief Funds for lost wage payments, in accordance with section 408(e)(2) of the Stafford Act, Title 42, United States Code, Section 5174(e)(2). The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance ("LWA") to those receiving UI benefits. For example, in the Commonwealth of Virginia the LWA provided an additional $300 per week to claimants who were eligible for at least $100 week in UI compensation. LWA remained available until the authorized funds were expended in or about December 2020.

### *Economic Injury Disaster Loan*

23.    In addition to expanded unemployment insurance benefits, another source of relief provided by the CARES Act was the expansion of an existing disaster-related program: the Economic Injury Disaster Loan ("EIDL"), which is administered by the SBA. This program provides loan assistance, including $10,000 advances, for small businesses and other eligible entities for loans up to $2 million. The EIDL proceeds can be used to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred; however, such loan proceeds are not intended to replace lost sales or profits or for expansion of a business.

24.    Unlike certain other types of SBA-guaranteed loans, EIDL funds are issued directly from the United States Treasury and applicants apply through the SBA via an online portal and application. The EIDL application process, which also uses certain outside contractors for system support, collects information concerning the business and the business owner, including, but not limited to, the following: (a) information as to the gross revenues for the business prior to January 31, 2020; (b) the cost of goods sold; (c) the number of employees; and (d) information regarding the criminal history of the business owner. Applicants

7

electronically certify that the information provided is accurate and are warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds may result in sanctions, including criminal penalties.

25.     Since on or about July 11, 2020, the SBA has received and processed all EIDL applications in a cloud-based platform through computer servers located in Des Moines, Iowa.

26.     The SBA initiates all EIDL disbursement payments from its finance center located in Denver, Colorado, which transmits payment information through the Financial Management System ("FMS") to the United States Department of Treasury ("Treasury") through primary servers located in Sterling, Virginia, within the Eastern District of Virginia.  Treasury disburses EIDL funds through servers located outside the Eastern District of Virginia.

E.     STITH'S BUSINESSES

27.     The Virginia State Corporation Commission ("SCC") is a state agency with regulatory authority over business and economic interests in Virginia.  Among other functions, the SCC serves as the central registration office for corporations, limited partnerships, and limited liability companies.

28.     Beginning in or about August 2015, and continuing through a date unknown, but believed to be the present time, STITH was the registered agent and manager of HLS Trucking, LLC, ("HLS Trucking"), a limited liability company registered with the SCC on or about August 27, 2015.

29.     Beginning in or about September 2019, and continuing through on or about December 31, 2020, STITH was the registered agent and manager of HLS Cleaning Service, LLC ("HLS Cleaning"), a limited liability company registered with the SCC on or about September 16, 2019.

8

30.     The Virginia Department of Professional and Occupational Regulation ("DPOR") is an agency of Virginia's executive branch that oversees various regulatory boards and programs, including the Board for Contractors.  Among other functions, DPOR issues professional credentials, including licenses, certificates, and registrations, and enforces standards of professional conduct.  The Board for Contractors licenses businesses engaged in the construction, removal, repair, and improvement of facilities on properties owned by others.

31.     Between in or about March 2006 and in or about March 2008, STITH, doing business under the name "H & E Contractors," was licensed by the DPOR Board for Contractors to provide home improvement, landscape, and roofing services as a Class C contractor.  The DPOR Board for Contractors revoked STITH's license effective on or about March 31, 2008, based on STITH's failure to respond to its requests for information concerning complaints it had received.  Since this revocation, STITH has not been licensed to provide contracting services in the Commonwealth of Virginia.

32.     Virginia law prohibits contracting for or bidding upon the construction, removal, repair, and improvements to real property owned, controlled, and leased by another person without a license or certificate.

33.     From in or about 2008 through a date unknown, but believed to be the present time, STITH purported to work as a contractor under various business names, including "Howard Stith Roofing" and "H&E Contracting."  In his own name and through these unregistered and unlicensed businesses, STITH held himself out to be a legitimate and licensed contractor specializing in roofing repairs, replacement, and maintenance.

34.     J.G., G.C., G.P., and J.S. are elderly and retired individuals who own homes in the Richmond metro area, within the Eastern District of Virginia.  STITH purported to provide

roofing repair services to these and other individuals between in or about January 2015 through a date unknown but believed to be in or about the present time.

35.     Believing that STITH was performing needed repairs, these homeowners paid STITH hundreds of thousands of dollars for his services. To support the exorbitant amounts he charged, STITH provided falsified receipts and invoices for materials he never purchased and work he did not perform. In truth, STITH provided incomplete and inferior services—and, in some cases, none at all—in exchange for these payments.

F.     STITH'S EVASION OF FEDERAL INCOME TAX ASSESSMENT

36.     The Internal Revenue Service ("IRS") is an agency within the Department of the Treasury responsible for administering and enforcing the tax laws of the United States and collecting taxes owed to the Treasury of the United States by its citizens. The IRS assesses income tax based on Forms W-2 and 1099-MISC which it receives from employers. The IRS collects assessed taxes by, among other means, levying wages and bank accounts, and engaging in installment payment plans with individuals who have outstanding tax balances.

37.     STITH filed federal income tax returns for the calendar years 2015 through 2018, showing income earned through a trucking business. STITH did not report as income any of the money he received from the elderly homeowners to whom he purported to provide roofing repair services. STITH filed no federal income tax returns for the calendar years 2019 through 2021.

38.     Based on the check, cashier's check, and cash payments STITH received from several elderly homeowners, and the income he did report for 2018, STITH earned annual income in the following amounts:

10

| YEAR | AMOUNT |
|------|--------|
| 2018 | $239,376 |
| 2019 | $390,800 |
| 2020 | $722,143 |
| 2021 | $169,330 |
| **TOTAL** | **$1,521,649** |

39.     On or about June 3, 2019, STITH electronically filed a 2018 Form 1040, U.S. Individual Income Tax return, including a Schedule C, Profit or Loss From Business, which showed gross receipts on line 1 of $95,641 for a "Truck Driver" business. The Schedule C also reported total expenses of $77,875, for a net profit of $17,766. That profit was the only income reported on STITH's return, as reflected on Form 1040, Line 6 for Total Income. STITH failed to report approximately $221,600 in payments he had received for alleged roofing work performed for at least two elderly homeowners in 2018. This income should have been reported as "Other Income" on line 21 of Schedule 1 to STITH's Form 1040. When he filed his 2018 Form 1040, STITH declared, under penalties of perjury, that the Form 1040 was true, accurate, and complete. STITH's omission of the $221,600 he received from elderly homeowners in 2018 resulted in his underpayment of federal income taxes in the amount of approximately $62,251.97.

40.     Beginning in or about 2019 and continuing through at least 2021, in the Eastern District of Virginia, and elsewhere, STITH did willfully attempt to evade and defeat assessment of federal income tax due and owing by him to the United States of America for the years 2019, 2020, and 2021, in the amount of approximately $516,152.17.

11

### *Affirmative Acts of Income Tax Evasion*

41.    From in or about 2019, until at least in or about 2021, in the Eastern District of Virginia, and elsewhere, STITH did willfully attempt to evade and defeat the assessment of substantial individual income taxes due and owing by him to the United States for the calendar years 2019, 2020, and 2021, by, among others, the following affirmative acts:

    a.  Between 2018 and 2020, STITH opened, maintained, and used at least twelve (12) bank accounts at three different financial institutions.

    b.  STITH instructed elderly homeowners to pay him by check, cashier's check, and cash.  In most instances, when paid by check, STITH quickly converted the check to cash by cashing it a check cashing business in Richmond, Virginia.  Between 2018 and 2021, STITH cashed at least 74 checks from elderly homeowners in the amount of at least $500,000 at such check cashing businesses.

    c.  Having converted the proceeds of his scheme entirely to cash, STITH thereafter dealt heavily in cash by (1) using the converted proceeds to make large cash payments on several different vehicles; and (2) depositing cash proceeds into at least ten different bank accounts across three financial institutions, generally in smaller amounts over the course of several days or weeks.  STITH then expended and withdrew the deposited funds from each of those accounts.

    d.  Through these transactions, STITH avoided creating deposit records, covered up the sources of his income, and concealed the nature and purpose of the payments he had received from the elderly homeowners.

    e.  STITH failed to keep books and records associated with a roofing business.

    f.  Until in or about September 2020, STITH did not maintain any bank accounts associated with a roofing business.  Even after opening a BB&T business

12

checking account (last four digits 2063) in the name of "Howard Stith Jr. DBA Howard Stith Roofing" on or about September 30, 2020, STITH never deposited any of the money he received from elderly homeowners into that account.

g.  Despite having failed entirely to file a federal income tax return for tax year 2019, STITH prepared and submitted a 2019 Form 1040 to the U.S. Small Business Administration to support his application on or about October 1, 2020, for an EIDL for "Howard Stith Roofing." Although he acknowledged receiving income through his roofing business in both the EIDL application and the accompanying 2019 Form 1040, STITH still significantly underreported the total income he had derived from elderly homeowners in 2019, thereby concealing the income STITH had obtained by purporting to provide roofing repair services to elderly homeowners. Specifically, Line 1 of Schedule C, Profit or Loss from Business, to the 2019 Form 1040 submitted to the SBA substantially underreported such income by more than $140,000.

h.  Stith also claimed significant gross revenues in 2019 and 2020 for two other businesses, HLS Cleaning Service LLC and HLS Trucking LLC, on EIDL applications made for those businesses, despite not reporting any such income to the IRS.

i.  After submitting to an interview with U.S. Secret Service agents on or about April 6, 2021, regarding the EIDL funds and roofing payments he had received, STITH began using nominees to receive payments from elderly homeowners. Specifically, STITH began instructing elderly homeowners to make multiple check payments on the same day, in smaller amounts, and to make those checks

payable to other individuals, including R.D. and V.S., who cashed these checks

and provided the proceeds thereof to STITH.

G.    STITH'S BORROWING

42.    After making large cash payments on several different vehicles, STITH applied to

finance the remainder of their purchase price and/or to refinance the vehicles with various

financial institutions, including Credit Union of Richmond.

43.    Among other applications, STITH submitted the following loan applications to

Credit Union of Richmond on or about the following dates:

| Date (On or About) | Borrower | Collateral | Amount Financed | Loan Number |
|---|---|---|---|---|
| 6/4/2019 | Howard Lee Stith Jr. | 2018 Dodge Charger SRT Hellcat (VIN ending 2687) | $51,542.29 | 64 |
| 2/10/2020 | Howard Lee Stith Jr. | 2016 Audi RS 7 Prestige (VIN ending 5815) | $79,228.66 | 69 |

44.    In the applications associated with these loans, STITH indicated that he worked

full time as a driver for Gout Xpress Inc, earning approximately $10,000 per month.  STITH did

not report any income from a roofing business.

45.    To substantiate the income he claimed, STITH provided Credit Union of

Richmond two falsified Form 1040s for tax years 2017 and 2018.  Line 7 on each of these forms

indicated that STITH's adjusted gross income for those years was approximately $100,000 more

than the amount STITH reported on the Form 1040s that he filed with the IRS for tax years 2017

and 2018.

## COUNTS ONE THROUGH EIGHT

THE GRAND JURY CHARGES THAT:

46.     The factual allegations contained in paragraphs 1 through 45 are incorporated herein by reference as if set out in full.

47.     Beginning in or about at least June 2020 and continuing through an unknown date believed to be at least February 2021, in the manner set forth below, in the Eastern District of Virginia and elsewhere, HOWARD LEE STITH, JR., STITH herein, aided and abetted by others, and along with others known and unknown to the Grand Jury, knowingly devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false, fraudulent, and fictitious pretenses, representations, and promises, which scheme and artifice, and the execution thereof, operated in substance as follows:

A.      THE SCHEME AND ARTIFICE

48.     The primary purpose and object of STITH's scheme and artifice was to unlawfully enrich himself and others by obtaining unemployment insurance benefits and EIDL proceeds to which he was not entitled through materially false pretenses, representations, and promises.

### *Unemployment Insurance Benefits*

49.     It was part of the scheme and artifice that STITH, aided and abetted by others and along with others, submitted at least two online applications to the VEC on or about June 26, 2020, and on or about June 29, 2020, in which he falsely claimed entitlement to expanded unemployment insurance benefits by falsely stating and certifying, among other things, that he was not then working; was not self-employed, a business owner, or a contractor; and had not received any income from any other source during the relevant period.

50.     It was further part of the scheme and artifice that, on or about July 2, 2020,

STITH, aided and abetted by others and along with others, submitted several weekly PUA claim

certifications in which he falsely certified that he did not perform any work or engage in any

self-employment between on or about March 15, 2020, and on or about June 27, 2020.

51.     It was further part of the scheme and artifice that, thereafter, STITH, aided and

abetted by others and along with others, continued to submit false PUA claim certifications in

which he falsely represented and certified that he did not perform any work or engage in any

self-employment between on or about June 28, 2020, and on or about August 1, 2020.

52.     It was further part of the scheme and artifice that, through these materially false

applications and weekly claim certifications, STITH, aided and abetted by others and along with

others, caused the VEC to pay him unemployment insurance benefits to which he was not

actually entitled, including PUA, FPUC, and LWA benefits, in the amount of at least $13,000.00,

causing losses to the VEC.

53.     It was further part of the scheme and artifice that STITH received these

fraudulently obtained unemployment insurance benefits via direct deposit into bank accounts that

he controlled and from which he thereafter disbursed those fraudulently obtained funds.

### *HLS Cleaning EIDL*

54.     It was further part of the scheme and artifice that, on or about July 18, 2020,

STITH, aided and abetted by others and along with others, applied online to receive an EIDL for

HLS Cleaning in the amount of at least $7,500, in which he falsely represented and certified the

amount of HLS Cleaning's gross revenues and cost of goods for the 12 months preceding

January 31, 2020, and number of employees as of January 31, 2020, thereby causing the SBA to

approve the requested loan.

55.     It was further part of the scheme and artifice that, on or about August 31, 2020, STITH, aided and abetted by others and along with others, digitally signed an SBA Loan Authorization and Agreement in which he agreed and promised to use all EIDL proceeds solely as working capital to alleviate economic injury suffered by HLS Cleaning as a result of the COVID-19 pandemic.  On or about the same date, STITH, aided and abetted by others and along with others, also signed an SBA Note in which he agreed to repay the SBA one and one-half times the proceeds disbursed if any of those proceeds were misapplied, that is, not used for authorized purposes.

56.     It was further part of the scheme and artifice that, by submitting the above-described documents containing the above-described materially false pretenses, representations, and promises, STITH, aided and abetted by others and along with others, caused the SBA to approve and pay an EIDL in the amount of $7,500 ("HLS Cleaning EIDL") to which HLS Cleaning and STITH were not actually entitled.

57.     It was further part of the scheme and artifice that STITH, aided and abetted by others and along with others, received the proceeds of the HLS Cleaning EIDL on or about August 11, 2020, via direct deposit into a bank account that STITH controlled and from which he thereafter disbursed those fraudulently obtained funds.

### *HLS Trucking EIDL*

58.     It was further part of the scheme and artifice that, on or about August 28, 2020, STITH, aided and abetted by others and along with others, applied online to receive an EIDL for HLS Trucking in the amount of at least $105,000, in which he falsely represented and certified the amount of HLS Trucking's gross revenues for the 12 months preceding January 31, 2020, and number of employees as of January 31, 2020, thereby causing the SBA to approve the requested loan.

59.     It was further part of the scheme and artifice that, on or about August 31, 2020, STITH, aided and abetted by others and along with others, digitally signed an SBA Loan Authorization and Agreement in which he agreed and promised to use all EIDL proceeds solely as working capital to alleviate economic injury suffered by HLS Trucking as a result of the COVID-19 pandemic.  On or about the same date, STITH, aided and abetted by others and along with others, also signed (1) an SBA Note in which he agreed to repay the SBA one and one-half times the proceeds disbursed if any of those proceeds were misapplied, that is, not used for authorized purposes; and (2) an SBA Security Agreement in which he promised the SBA a security interest in all of HLS Trucking's tangible and intangible personal property.

60.     It was further part of the scheme and artifice that, by submitting the above-described documents containing the above-described materially false pretenses, representations, and promises, STITH, aided and abetted by others and along with others, caused the SBA to • approve and pay an EIDL in the amount of $105,000 ("HLS Trucking EIDL") to which HLS Trucking and STITH were not actually entitled.

61.     It was further part of the scheme and artifice that STITH, aided and abetted by others and along with others, received the proceeds of the HLS Trucking EIDL on or about September 2, 2020, via direct deposit into a bank account that STITH controlled and from which he thereafter disbursed those fraudulently obtained funds.

### *Howard Stith Roofing EIDL Application*

62.     It was further part of the scheme and artifice that, in addition to the HLS Cleaning and HLS Trucking EIDL loans, STITH, aided and abetted by others and along with others, applied for other EIDLs in the names of various businesses, including at least one in the name of "Howard Stith Roofing."  Specifically, on or about October 1, 2020, STITH, aided and abetted by others and along with others, applied online to receive an EIDL for Howard Stith Roofing.  In

18

the application, STITH falsely underrepresented and certified the amount of Howard Stith

Roofing's gross revenues for the 12 months preceding January 31, 2020.  STITH also falsely

represented and certified the number of employees as of January 31, 2020.  To substantiate his

false statements regarding the claimed revenue for Howard Stith Roofing, Stith, aided and

abetted by others and along with others, submitted a false 2019 Form 1040 that included a

Schedule C, Profit or Loss from Business, that substantially underreported on Line 1 (Gross

receipts or sales) the income that STITH obtained by purporting to provide roofing repair

services to elderly homeowners.  STITH did not file this return or any other federal income tax

return with the IRS for tax year 2019.  Ultimately, the SBA did not approve the requested loan.

B.       EXECUTION OF THE SCHEME AND ARTIFICE

63.      For the purpose of executing the aforesaid scheme and artifice, STITH, aided and

abetted by others and along with others, did knowingly and willfully transmit and cause to be

transmitted by means of wire communications in interstate commerce, the following certain

information, signs, signals, and sounds:

### *Unemployment Insurance Benefits*

| Count | Date (On or About) | Description of Wire |
|-------|--------------------|---------------------|
| 1 | July 2, 2020 | Transfer and deposit of VEC UI benefits totaling $10,170.00 to VACU account (last four digits 4067) following the electronic submission to the VEC of weekly certifications of STITH's continued eligibility to receive UI benefits that contained materially false denials of self-employment, work performed, and income from any source. |
| 2 | July 8, 2020 | Transfer and deposit of VEC UI benefits totaling $758.00 to VACU account (last four digits 4067) following the electronic submission to the VEC of weekly certifications of STITH's continued eligibility to receive UI benefits that contained materially false denials of self-employment, work performed, and income from any source. |

| Count | Date (On or About) | Description of Wire |
|-------|--------------------|---------------------|
| 3 | August 18, 2020 | Transfer and deposit of VEC UI benefits totaling $1,674.00 to VACU account (last four digits 4067) following the electronic submission to the VEC of weekly certifications of STITH's continued eligibility to receive UI benefits that contained materially false denials of self-employment, work performed, and income from any source. |

### *EIDLs*

| Count | Date (On or About) | Description of Wire |
|-------|--------------------|---------------------|
| 4 | July 18, 2020 | Electronic submission to the SBA of online EIDL application for HLS Cleaning containing materially false representations concerning gross revenue, cost of goods, and number of employees. |
| 5 | August 10, 2020 | SBA funding of HLS Cleaning EIDL totaling $7,500.00 via direct deposit into the Credit Union of Richmond account (ending in 2792 (01)) issued to Howard Lee Stith Jr. |
| 6 | August 28, 2020 | Electronic submission to the SBA of online EIDL application for HLS Trucking containing materially false representations concerning gross revenue and number of employees. |
| 7 | September 1, 2020 | SBA funding of HLS Trucking EIDL totaling $105,000.00 via direct deposit into the Credit Union of Richmond account (ending in 2792 (01)) issued to Howard Lee Stith Jr. |
| 8 | October 1, 2020 | Electronic submission to the SBA of online EIDL application for Howard Stith Roofing containing materially false representations concerning gross revenue and number of employees. |

(In violation of Title 18, United States Code, Sections 1343 and 2).

## COUNTS NINE THROUGH TWENTY-ONE

THE GRAND JURY CHARGES THAT:

64.     The factual allegations contained in paragraphs 1 through 45 are incorporated

herein by reference as if set out in full.

65.     Beginning in or about at least January 2015 and continuing through an unknown

date, but believed to be the present time, in the manner set forth below, in the Eastern District of

Virginia and elsewhere, HOWARD LEE STITH, JR., STITH herein, aided and abetted by

others, and along with others known and unknown to the Grand Jury, knowingly devised and

intended to devise a scheme and artifice to defraud and for obtaining money and property by

means of materially false, fraudulent, and fictitious pretenses, representations, and promises,

which scheme and artifice, and the execution thereof, operated in substance as follows:

### *The Scheme and Artifice*

66.     The primary purpose and object of STITH's scheme and artifice was to

unlawfully enrich himself and others by defrauding elderly homeowners of significant sums

through false and fraudulent representations and promises concerning the condition of the

victims' homes, needed repairs, and the performance of those repairs by STITH and others.

67.     It was part of the scheme and artifice that STITH would appear unsolicited at the

residences of homeowners in the Richmond metro area, including J.G., G.C., G.P., and J.S., and

falsely and fraudulently represent to those homeowners that their roofs needed various, often

extensive, repairs, including but not limited to the replacement of purportedly inadequate "short

slates."

68.     It was further part of the scheme and artifice that STITH would promise to

perform the purportedly needed repairs for a fee, often based on a price-per-foot of work or

number of materials, as determined by STITH.

69. It was further part of the scheme and artifice that, during his interactions with homeowners, STITH falsely represented himself to be a licensed contractor when, in truth and fact, as STITH then and there well knew, his contractor's licenses had been revoked effective on or about March 31, 2008, and was never thereafter reinstated.

70. It was further part of the scheme and artifice that STITH and others purported to perform the promised repairs and, thereafter, falsely and fraudulently represented to the homeowners that they had corrected the previously described deficiencies when, in truth and fact, STITH and others often failed to fix existing problems and caused further damage to the homeowners' roofs.

71. It was further part of the scheme and artifice that STITH continued to return unsolicited to the targeted homeowners' residences numerous times over the course of months and years, each time falsely and fraudulently claiming that the homeowners' roofs required various additional repairs. Each time, STITH promised to perform the repairs for a fee, often based on a price-per-foot of work or number of materials, as determined by STITH. As before, STITH and others would purport to perform the promised work but in fact would often fail to correct existing issues and cause further damage to the homeowners' roofs.

72. It was further part of the scheme and artifice that STITH created and falsified receipts and invoices for roofing repair materials, which he then provided to the targeted homeowners for the purpose of falsely and fraudulently substantiating the significant sums STITH charged—and continued to charge—for the claimed repairs.

73. It was further part of the scheme and artifice that STITH falsely promised homeowners extended and lifetime warranties on the work performed and, in some cases, on the entire roof, and, thereafter, continued to charge those homeowners significant sums for further purported repairs.

22

74.    It was further part of the scheme and artifice that STITH targeted—and frequently returned to—homes occupied by elderly individuals, including J.G., G.C., G.P., and J.S., many of whom were physically incapable of inspecting and verifying the work STITH and others purported to perform.

75.    It was further part of the scheme and artifice that STITH collected payments from the homeowners, including cash, cashier's checks, and checks, as payment for the claimed repairs.

76.    It was further part of the scheme and artifice that, very shortly after collecting such payments, STITH cashed homeowner check payments at financial institutions and check cashing businesses in and around Richmond, Virginia, within the Eastern District of Virginia. STITH's negotiation of these checks at these locations caused the transmission of information via interstate wires from, through, and to computer servers within the Eastern District of Virginia to, through, and from computer servers located outside the Commonwealth of Virginia.

77.    Through this scheme and artifice, STITH fraduelently obtained money to which he was not entitled in the amount of at least $1,500,000.

### *Execution of the Scheme and Artifice*

78.    For the purpose of executing the aforesaid scheme and artifice, STITH, aided and abetted by others and along with others, did knowingly and willfully transmit and cause to be transmitted by means of wire communications in interstate commerce, the following certain signs, signals, and sounds:

| Count | Date (On or About) | Description of Wire |
|-------|--------------------|---------------------|
| 9 | October 26, 2020 | Negotiation of $7,000.00 check drawn on the PenFed account (last four digits 4036) of J.G. at a Check City located in Richmond, Virginia. |

| 10 | October 28, 2020 | Negotiation of $2,000.00 check drawn on the Wells Fargo account (last four digits 8441) of J.G. and $3,000.00 check drawn on PenFed account (last four digits 4036) of J.G. at a Check City located in Richmond, Virginia. |
| 11 | October 30, 2020 | Negotiation of $10,000.00 check drawn on the PenFed account (last four digits 4036) of J.G. at a Check City located in Richmond, Virginia. |
| 12 | November 1, 2020 | Negotiation of $8,800.00 check drawn on the PenFed account (last four digits 4036) of J.G. at a Check City located in Richmond, Virginia. |
| 13 | November 2, 2020 | Negotiation of $8,000.00 check drawn on the PenFed account (last four digits 4036) of J.G. at a Check City located in Richmond, Virginia. |
| 14 | March 23, 2021 | Negotiation of $6,000 check drawn on Bank of America account (last four digits 2737) of G.C. at a Check City located in Richmond, Virginia. |
| 15 | March 26, 2021 | Negotiation of $10,250 check drawn on Bank of America account (last four digits 2737) of G.C. at a Check City located in Richmond, Virginia. |
| 16 | March 31, 2021 | Negotiation of $13,000 check drawn on Bank of America account (last four digits 2737) of G.C. at a Check City located in Richmond, Virginia. |
| 17 | April 2, 2021 | Negotiation of $12,700 check drawn on Bank of America account (last four digits 2737) of G.C. at a Check City located in Richmond, Virginia. |
| 18 | April 7, 2021 | Negotiation of $9,000 check drawn on Bank of America account (last four digits 2737) of G.C. at a Check City located in Richmond, Virginia. |
| 19 | October 1, 2021 | Negotiation of $1,000 check drawn on Bank of America account (last four digits 7322) of J.S. and made payable to V.S. at a Check City located in Richmond, Virginia. |
| 20 | October 2, 2021 | Negotiation of $8,000 check drawn on Bank of America account (last four digits 7322) of J.S. and made payable to V.S. at a Check City located in Richmond, Virginia |

| 21 | October 12, 2021 | Deposit of $13,000 check drawn on Bank of America account (last four digits 7322) of J.S. and made payable to R.D. into Credit Union of Richmond account belonging to R.D. (last four digits 6007) |

(In violation of Title 18, United States Code, Sections 1343 and 2).

## COUNT TWENTY-TWO

THE GRAND JURY CHARGES THAT:

79.    The factual allegations contained in paragraphs 1 through 45 are incorporated herein by reference as if set out in full.

80.    On or about June 3, 2019, in the Eastern District of Virginia, the defendant, HOWARD LEE STITH, JR. ("STITH"), a resident of Freeman, Virginia, did willfully make and subscribe a 2018 Form 1040, which was verified by a written declaration that it was made under the penalties of perjury and which STITH did not believe to be true and correct as to every material matter. That 2018 Form 1040, which was submitted electronically to the Internal Revenue Service, falsely stated the following regarding STITH's income in 2018:

| Form | Schedule or Page | Line | False Statement |
|------|------------------|------|-----------------|
| 1040 | Schedule C – Profit or Loss from Business | 1 – Gross receipts or sales | $95,641 |
| 1040 | Schedule C – Profit or Loss from Business | 29 – Tentative profit or (loss) | $17,766 |
| 1040 | Page 2 | 6 – Total income | $17,766 |
| 1040 | Page 2 | 10 – Taxable income | $3,609 |

In truth and fact, STITH then and there knew he had failed to report on 2018 Form 1040, Schedule C, Line 1 (Gross receipts or sales) approximately at least $221,600 in gross receipts obtained in 2018 from elderly homeowners to whom he purported to provide roofing repair services and likewise failed to report such profit on 2018 Form 1040, Schedule C, Line 29 (Tentative profit or (loss)). STITH further knew that, because of his failure to report such profit on the 2018 Form 1040, Schedule C, the amounts listed on Lines 6 and 10 of his 2018 Form 1040 substantially and materially underreported his total and taxable income for that year,

26

resulting in an underpayment of STITH's federal income tax in the amount of approximately at least $62,000.

(In violation of Title 26, United States Code, Section 7206(1)).

## COUNTS TWENTY-THREE THROUGH TWENTY-FIVE

THE GRAND JURY CHARGES THAT:

81.     The factual allegations contained in paragraphs 1 through 45 are incorporated herein by reference as if set out in full.

82.     From in or about January 2019, to the date of this indictment, in the Eastern District of Virginia and elsewhere, the defendant, HOWARD LEE STITH, JR. ("STITH"), a resident of Freeman, Virginia, received taxable income, upon which there was income tax due and owing to the United States of America.  Knowing the foregoing facts and failing to make an income tax return on or before the following dates, as required by law, to any proper officer of the Internal Revenue Service, and to pay the income tax to the Internal Revenue Service, STITH did willfully attempt to evade and defeat the assessment of the income tax due and owing by him to the United States of America for the following calendar years in the following amounts by, among others, the affirmative acts listed in Paragraph 41 of the General Allegations section.

| Count | Required Filing Date (On or About) | Calendar Year | Approximate Amount of Tax Due & Owing |
|-------|-----------------|---------------|---------------------------------------|
| 23    | July 15, 2020   | 2019          | $153,258.58                           |
| 24    | May 17, 2021    | 2020          | $310,190.89                           |
| 25    | April 18, 2022  | 2021          | $52,702.70                            |

(In violation of Title 26, United States Code, Sectionp 7201).

28

## COUNTS TWENTY-SIX THROUGH TWENTY-EIGHT

THE GRAND JURY CHARGES THAT:

83.    The factual allegations contained in paragraphs 1 through 45 are incorporated herein by reference as if set out in full.

84.    During the following calendar years, the defendant, HOWARD LEE STITH, JR. ("STITH") who was a resident of Freeman, Virginia, had and received gross income of at least the following amounts.  By reason of such gross income, he was required by law, following the close of each calendar year and on or before the following dates, to make an income tax return to the Internal Revenue Service Center, at Louisville, Kentucky, to a person assigned to receive returns at the local office of the Internal Revenue Service at Richmond, Virginia, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled.  Well knowing and believing all the foregoing, STITH did willfully fail, on or about the following dates, in the Eastern District of Virginia and elsewhere, to make an income tax return:

| Count | Offense Date (On or About) | Calendar Year | Approximate Gross Income |
|-------|----------------------------|---------------|--------------------------|
| 26    | July 15, 2020              | 2019          | $390,800.00              |
| 27    | May 17, 2021               | 2020          | $722,143.00              |
| 28    | April 18, 2022             | 2021          | $169,330.00              |

(In violation of Title 26, United States Code, Section 7203).

## COUNTS TWENTY-NINE THROUGH THIRTY

THE GRAND JURY CHARGES THAT:

85.     The factual allegations contained in paragraphs 1 through 45 are incorporated

herein by reference as if set out in full.

86.     On or about the following dates, in the Eastern District of Virginia and elsewhere,

the defendant, HOWARD LEE STITH, JR. ("STITH"), aided and abetted by others and along

with others, knowingly made a false statement or report for the purpose of influencing the action

of Credit Union of Richmond, a State-chartered credit union, in connection with the following

applications and loans, in that STITH provided Credit Union of Richmond two falsified Form

1040s for tax years 2017 and 2018, each of which, as STITH then and there well knew, falsely

indicated on Line 7 that STITH's adjusted gross income was approximately $100,000 more than

the amount STITH reported on the Form 1040s that he filed with the IRS for tax years 2017 and

2018:

| Count | Date (On or About) | Loan Number | Borrower | Amount Financed | False Statement |
|-------|------|------|----------|--------|-----------------|
| 29 | 6/4/2019 | 64 | Howard Lee Stith, Jr. | $51,542.29 | False Forms 1040 for tax years 2017 and 2018 |
| 30 | 2/10/2020 | 69 | Howard Lee Stith, Jr. | $79,228.66 | False Forms 1040 for tax years 2017 and 2018 |

(In violation of Title 18, United States Code, Sections 1014 and 2).

30

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) Fed. R. Crim. P., defendant, HOWARD LEE STITH, JR., is

hereby notified that upon conviction of any of the offenses alleged in Counts One through Eight

of this Indictment, he shall forfeit to the United States any property constituting, or derived from,

proceeds traceable to such violations.

The property subject to forfeiture includes, but is not limited to, the following:

A sum of money of at least $125,500, which represents the proceeds of the scheme

described and charged in Counts One through Eight and which shall be reduced to a money

judgment against STITH in favor of the United States.

The defendant, HOWARD LEE STITH, JR., is further notified that upon conviction of

any of the offenses alleged in Counts Nine through Twenty-One of this Indictment, he shall

forfeit to the United States any property constituting, or derived from, proceeds traceable to such

violations.

The property subject to forfeiture includes, but is not limited to, the following:

A sum of money of at least $1,282,273.00, which represents the proceeds of the scheme

described and charged in Counts Nine through Twenty-One and which shall be reduced to a

money judgment against STITH in favor of the United States.

The defendant, HOWARD LEE STITH, JR., is further notified that upon conviction of

any of the offenses alleged in Counts Twenty-Three through Twenty-Eight of this Indictment, he

shall forfeit to the United States (a) any property on which, or for or in respect whereof, any tax

is imposed by this title which shall be found in the possession or custody or within the control of

any person, for the purpose of being sold or removed by him in fraud of the internal revenue

laws, or with design to avoid payment of such tax, or which is removed, deposited, or concealed

31

with intent to defraud the United States of such tax or any part thereof; (b) all property found in the possession of any person intending to manufacture the same into property of a kind subject to tax for the purpose of selling such taxable property in fraud of the internal revenue laws, or with design to evade the payment of such tax; (c) all property whatsoever, in the place or building, or any yard or enclosure, where the property described in subsection (a) or (b) is found, or which is intended to be used in the making of property described in subsection (a), with intent to defraud the United States of tax or any part thereof, on the property described in subsection (a); (d) all property used as a container for, or which shall have contained, property described in subsection (a) or (b); and (e) any property used to transport or for the deposit or concealment of property described in subsection (a) or (b), or any property used to transport or for the deposit or concealment of property which is intended to be used in the making or packaging or property described in subsection (a).

The defendant, HOWARD LEE STITH, JR., is further notified that upon conviction of any of the offenses alleged in Counts Twenty-Nine and Thirty of this Indictment, he shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such violations.

The property subject to forfeiture includes, but is not limited to, the following:

A sum of money of at least $130,770.95, which represents the proceeds of the offenses charged in Counts Twenty-Nine and Thirty and which shall be reduced to a money judgment against STITH in favor of the United States.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets, pursuant to 21 U.S.C. § 853(p).

(All in accordance with Title 18, United States Code, Sections 982(a)(2), and 981(a)(1)(C) and Title 26, United States Code, Sections 7301(a)-(e) and 7302 as incorporated by Title 28, United States Code 2461 and Title 21, United States Code, Section 853(p)).

32

A TRUE BILL:


FOREPERSON


JESSICA D. ABER
UNITED STATES ATTORNEY

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

By:    _Kaitlin G. Cooke_
Kaitlin G. Cooke
Assistant United States Attorney
Virginia State Bar # 83935
U.S. Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Tel. (804) 819-5400
Fax: (804) 771-2316


By:    _____
Kashan K. Pathan
IL Bar No. 6327422
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: kashan.pathan@usdoj.gov